UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JAMARI BROOKS,
      Plaintiff,                  CASE NO.: 3:25-cv-00771-WWB-LLL
vs.

THOMAS K. WATERS, in his official capacity
as Sheriff of JACKSONVILLE SHERIFF'S OFFICE,
CHETH PLAUGHER, BEAU DAIGLE, TREY
MCCULLOUGH, HUNTER SULLIVAN,
LEMMUEL JOHNSON, JOSUE GARRIGA,
DOUG HOWELL, JOHN DOEs (I-II), and
CITY OF JACKSONVILLE,
      Defendants.
_____/

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, JAMARI BROOKS, (hereinafter "BROOKS"), by and through the undersigned attorneys, and hereby files this Complaint against Defendants, THOMAS K. WATERS, in his official capacity as Sheriff of JACKSONVILLE SHERIFF'S OFFICE ("SHERIFF WATERS"), and Deputy CHETH PLAUGHER ("PLAUGHER"), Deputy BEAU DAIGLE ("DAIGLE"), Deputy TREY MCCULLOUGH ("MCCULLOUGH"), Deputy HUNTER SULLIVAN ("SULLIVAN"), Deputy LEMMUEL JOHNSON ("JOHNSON"), and Deputy JOSUE GARRIGA ("GARRIGA"), AND JOHN DOE I and II, each in their individual capacities and for acts that occurred during the course and scope of their employment with Jacksonville Sheriff's Office ("JSO"), and the CITY OF JACKSONVILLE. In support, Plaintiff states as follows:

1

## INTRODUCTION

This lawsuit arises from an encounter on or about July 21, 2022, involving an innocent citizen of Jacksonville, Plaintiff BROOKS, and the Jacksonville Sheriff's Office Gang Unit. BROOKS was attending a doctor's visit and committed no crime when he was improperly detained and improper force used upon him. He was simply going to a therapy appointment. He cooperated with the police. He did not run from them.

The incident involves Gang Unit officers misidentifying an innocent citizen, the citizen freely giving himself up to police custody in response to several, heavily armed officers approaching him, and said officers slamming his head into the parking lot surface. The officers released a police service dog on to the misidentified, innocent citizen, and then yelled contradictory commands at the citizen while the dog bit and tore at his arm and dragged him across the parking lot, violating both federal and state, laws and constitutions.

This incident also involves officers stepping on the neck of the misidentified, innocent citizen; officers yelling at him to "stop resisting" while he laid on the hot parking lot; and the citizen getting thrashed from side to side by a dog without any reason for the dog's use, in violation of JSO policy. It also involves officers on scene manipulating their body cameras by blocking the lens of their camera with their hands and selectively turning off their cameras, including immediately

2

following a conversation about the officers detaining the wrong individual.

The officers only asked for the citizen's name after releasing a dog on to him. The officers entirely mischaracterized the incident in their reports, in complete contradiction to the body worn camera footage that was allowed to be taped. And, as shown later, this is part of a pattern and practice of police brutality and constitutional violations by the officers on the Jacksonville Gang Unit.

It is from this incident that BROOKS brings these federal constitutional claims against the Defendant officers for committing acts under color of law that deprived Plaintiff of his rights under the United States Constitution by using excessive and unreasonable force against the Plaintiff. BROOKS also brings State law claims against the Defendant officers.

BROOKS brings federal constitutional claims against SHERIFF WATERS and his local Sheriff's Office, JSO, as the supervisory entity responsible for the conduct, training, and supervision of the Sheriff's Deputies under his/its charge. SHERIFF WATERS failed to properly train JSO Deputies in the appropriate methods, proper procedures, and Constitutionally-valid protocols with respect to the use of force when conducting an arrest and specifically with canine use of force. SHERIFF WATERS also failed to enforce written policy regarding management of canine teams. In doing so, SHERIFF WATERS established an atmosphere of procedures and customs that resulted in deliberate indifference to

the Plaintiff's Constitutional rights and the protections of the laws of the State of Florida.

## JURISDICTION, PARTIES AND VENUE

1. This is an action for damages in tort as well as deprivation of civil rights guaranteed by the United States Constitution via 42 U.S.C. §§ 1983 and 1988, the Fourth Amendment of the U.S. Constitution, and Florida state law.

2. The Court has federal question jurisdiction over Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Plaintiff's state law claims are related to these federal claims and form a part of the same case or controversy. The Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

3. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b), as all Defendants work and/or reside in this District, and all of the acts and omissions giving rise to this action occurred in Duval County, Florida.

4. All conditions precedent to the maintenance of this action, including those set forth in Florida Statute § 768.28, have been performed, have occurred prior to its institution, or have been waived, including but not limited to the City of Jacksonville's denial of the Plaintiff's claim.

5. Plaintiff BROOKS, at all times material hereto, was and is an adult resident of Duval County, Florida. All material incidents occurred in Duval

County, Florida.

6.     Defendant SHERIFF WATERS, was, at all times material hereto, the elected Sheriff of JACKSONVILLE SHERIFF'S OFFICE ("JSO") and was responsible for overseeing the JSO, the governmental entity responsible for providing law enforcement services in and around Jacksonville, Duval County, Florida. SHERIFF WATERS is sued herein in his official capacity as Sheriff of JSO.

7.     Defendant SHERIFF WATERS is also charged with promulgating all orders, rules, instructions, and regulations of JSO, including, but not limited to, those orders, rules, instructions, and regulations concerning, stops, searches, and seizures. At all times relevant, SHERIFF WATERS had the power, right, and duty to control his officers to conform to the United States Constitution and Florida state law, and to ensure that all orders, rules, instructions, and regulations promulgated for JSO were consistent with the United States Constitution and Florida state law. At all times relevant to this complaint, SHERIFF WATERS, and his agents and employees acted under color of law.

8.     At all times material hereto, Defendant, PLAUGHER, was a resident of, or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, PLAUGHER, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's

policies and procedures, and under the color of state law.

9.      At all times material hereto, Defendant, DAIGLE, was a resident of, or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, DAIGLE, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's policies and procedures, and under the color of state law.

10.      At all times material hereto, Defendant, MCCULLOUGH, was a resident of, or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, MCCULLOUGH, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's policies and procedures, and under the color of state law.

11.      At all times material hereto, Defendant, SULLIVAN, was a resident of, or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, SULLIVAN, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's policies and procedures, and under the color of state law.

12.      At all times material hereto, Defendant, JOHNSON, was a resident of,

6

or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, JOHNSON, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's policies and procedures, and under the color of state law.

13.     At all times material hereto, Defendant, GARRIGA, was a resident of, or worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendant, GARRIGA, was employed by Jacksonville Sheriff's Office as a law enforcement officer and was acting in conformance with JSO's policies and procedures, and under the color of state law.

14.     Defendants JOHN DOE I and II represent unknown officers. Each worked in, Duval County, Florida as a law enforcement officer, and committed acts and omissions contained herein, in Duval County, Florida. At all times material, Defendants DOE I and II were employed by Jacksonville Sheriff's Office as law enforcement officers and was acting in conformance with JSO's policies and procedures, and under the color of state law.

## FACTUAL ALLEGATIONS

15.     On or about July 21, 2022, BROOKS was going to see a medical professional around 12 PM.

16.    At all times material, Defendants, PLAUGHER, DAIGLE, MCCULLOUGH, SULLIVAN, JOHNSON, and GARRIGA, as well as police canine Huk, at all times material, were on duty and in the course and scope of their employment as law enforcement officers for JSO, under the supervision of SHERIFF WATERS.

17.    On the day of the incident, the above-named Defendants were affiliated and on assignment with the Jacksonville Sheriff's Office Gang Unit.

18.    BROOKS entered said medical professional's office without incident, specifically without law enforcement officers attempting a traffic stop of the vehicle he traveled in, surrounding him, and/or giving him lawful orders or instructions.

19.    Upon arrival, the receptionist told BROOKS that the medical professional was on lunch break and would be available at 2 p.m.

20.    BROOKS left the office. When he walked out the door there were several JSO Gang Unit officers standing around the entrance of the building.

21.    Upon exiting the medical office and seeing several police officers approach, BROOKS freely gives himself up and voluntarily lays down on his stomach with his arms outstretched in front of him.

22.    BROOKS submitted to Defendant, DAIGLE, who proceeded to kneel

on BROOKS's back and shove BROOKS's head into the ground, clearly taking BROOKS into custody. At this point, Defendant, DAIGLE, got off BROOKS and Defendant, PLAUGHER, released the canine on BROOKS, biting him in the arm and jerking him side to side. BROOKS had screws in this arm, along with very limited mobility, dating back to before this incident.

23.    BROOKS endured nearly an entire minute of the police dog biting and tearing into his arm.

24.    The video depicts the police canine shaking his head with BROOKS's arm in his mouth and dragging BROOKS across the surface of the parking lot, which clearly is enough force to cause the puncture and tearing of skin and muscles.

25.    Video shows officers then yelling contradictory commands (e.g. "lay down;" "roll over;" "put your hands behind your back;" and "stop resisting") at BROOKS, circling him, and pointing and screaming while allowing the dog to continue tearing into his arm.

26.    Meanwhile, BROOKS was confused, he didn't know what was going on, consistently asking what he did to lead to the subject incident, with JSO officers simultaneously asking him who he was.

27.    Instead of a proper release command, or alternatively using a breaker bar, an officer has to physically pull the canine off of BROOKS. Body cam footage

9

clearly shows Defendant, PLAUGHER, struggle to pull canine Huk off of BROOKS, yanking at the dog's scruff, attempting to lift the dog off of BROOKS. You can see canine Huk lunging for BROOKS in the distance.

28. Even prior to the canine's biting of BROOKS, you can see on camera that Defendant, PLAUGHER, had lost control of the dog, with it not running at his side, yanking towards BROOKS once it rounds the JSO vehicle, and running over top of BROOKS several times before latching on to his arm. Again, BROOKS was lying on the ground and was not a threat to any of the officers at this point, nor any other.

29. After Huk finally releases BROOKS, several officers have their body weight on BROOKS as they handcuff him, including but not limited to placing knees on his back and boots on his neck.

30. JSO's use of the police dog was in direct violation of agency policy, which states a police service dog "shall not be used . . . **REDACTED . . .** except in cases of self-defense or to rescue an officer in distress."

31. JSO policy goes on to state that police service dogs may be used for criminal apprehensions "To arrest or prevent the escape from custody of any person the officer reasonably believes to have committed an offense . . .; To defend the handler or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to

prevent an escape . . ..."

32.     As BROOKS had freely given himself up to the officers, assuming a prone position with his arms outstretched in front of him, and as he was not resisting the officer who had shoved BROOKS's head into the ground and kneeled on his back, this was not a case of self-defense and there was no officer in distress. Further, as BROOKS was not the intended target of the police operation, but simply a different black male living in the same city as the intended target, use of the dog for an arrest was inappropriate, unwarranted, based on a prejudicial identification, and unconstitutional.

33.     As BROOKS had freely given himself up, every single Gang Unit officer on scene, with multiple officers already having guns drawn, had the ability to confirm the identity of BROOKS without threat to their persons and without the need to release an animal that would go on to cause severe, traumatic injuries to BROOKS.

34.     After the incident, JSO officers admitted they had the wrong person. Body cam footage from Defendant, GARRIGA, shows GARRIGA telling Defendant, DAIGLE, that BROOKS "ain't him" and "look just like him, but it ain't him."

35.     Defendant, GARRIGA, is believed to be the officer who misidentified BROOKS.

36.    Before going to Shands, police searched a car that BROOKS did not own, charging him with crimes which were not proper, legal, or warranted, a clear violation of the right against improper searches and seizures.

37.    The dysfunctional police report noted that detectives with the Gang Unit attempted to follow the vehicle with intentions to initiate a traffic stop; however, due to the alleged reckless driving behavior, a traffic stop was not able to be performed. The vehicle was allegedly observed by multiple Detectives traveling at more than 30 mph over the posted speed limit on several occasions while traveling on Interstate 295. Several minutes later, the ' vehicle was observed pulling into 1634 Blanding Blvd (Hyde Park Medical Center), at which time a black male wearing a black shirt and a lime green hat exited the Ford Mustang and entered Hyde Park Medical Center.

38.    Despite this alleged reckless driving, there is nothing in the report about officers turning on lights or sirens, nor actually attempting to pull over the driver of the vehicle. There is no evidence presented to prove to alleged recklessness of the vehicle's operation. Rather, it reads as allegations thrown in, in an attempt to smear the driver of the vehicle, after the fact, with hopes of making the later, unconstitutional uses of force reasonable.

39.    The report goes on to state that, approximately 1-2 minutes after entering Hyde Park Medical Center, the same black male wearing a black shirt and

lime green hat exited Hyde Park Medical Center and reentered the parking lot on foot. The report goes on to state that an officer exited an unmarked Jacksonville Sheriff's Office vehicle in an attempt to make contact with the described suspect. The report fails to mention that the officer was one of two JSO officers, all with marked police clothing, closing in quickly on Mr. BROOKS, and it fails to state that one of those officers approached BROOKS with a drawn weapon, pointed at him, cursing at BROOKS to get on the ground.

40.    The report goes on to falsely claim that BROOKS then "observed my presence and bladed himself behind unmarked Jacksonville Sheriff's Office police vehicle by positioning himself 1-2 foot from driver's side window. Body cam footage from several officers shows this is clearly not the case. Footage shows that as soon as officers identified themselves, BROOKS laid on the ground and gave himself up to the officers. This is indisputable and a direct falsehood as it relates to the sequence of events.

41.    The report falsely claims the suspect attempted to flee on foot once he realized law enforcement officers were at the scene. "At that time, I engaged the suspect on the right arm, and the black male suspect was taken into custody without incident (See canine report). It should be noted that the suspect, later positively identified as Jamari Brooks was holding a set of keys to the Ford Mustang in his right hand at the time of his apprehension. It was suspected that

he was attempting to flee on foot back towards the vehicle to drive away due to him reaching his right hand in his pocket to retrieve the keys prior to being taken into custody." Again, this is a complete falsehood, as the officers: a) did not see BROOKS attempt to flee at any time (nor did BROOKS ever so much as step away from the officers) as seen in the body cam footage; b) could not possibly have suspected him to be fleeing to the vehicle to drive away, based on him putting his hands in his pocket as they would not have known at the time what was in his individual pockets; and c) the body cam footage shows BROOKS lay on the ground and put his arms out in front of him prior to being detained, attacked, and arrested.

42.    The criminal proceeding was resolved in favor of Plaintiff, BROOKS's, by a dismissal of all charges. (See State of Florida v. Jamari Brooks, Case 2022-CF-7173.)

43.    The defense was BROOKS was under observation by JSO's Gang Unit because he was erroneously, unreasonably, and improperly identified as Jewell Hayes, who had previously been seen in the same or similar car.

44.    As noted in BROOKS's successful defense, the subject car Defendant had driven had not been reported stolen and there was not probable cause to believe that the car had been stolen. Defendant was the possessor and sole occupant of that vehicle and had a reasonable expectation of privacy in the car and

its contents.

45.    Prior to the search of the automobile, there was not probable cause to believe that the car contained contraband.

46.    There was not probable cause for Defendant's arrest, and there was no warrant or capias for his arrest.

47.    The search of the automobile was made possible by seizure of a key from Defendant's person incident to his arrest.

48.    The search of Defendant's person and the seizure of the key were incident to an unlawful arrest.

49.    The unjustified and unconstitutional use of force against BROOKS was not isolated, but rather it was part of a longstanding trend of similar instances of force and other forms of misconduct by JSO officers and, in particular, the JSO Gang Unit and its member officers.

50.    In 2015 while with another police department, Defendant, GARRIGA, shot and killed Andrew Williams while in the line of duty.

51.    In 2019 while with JSO, GARRIGA shot and killed Jamee Johnson while in the line of duty.

52.    GARRIGA was part of the Gang Unit group text thread that included racist dialogue about Jamee Johnson.

53.    In 2024, GARRIGA was convicted and sentenced to 24 years and 4 months in federal prison for enticing a child to engage in sexual activity during the time he was a detective with the JSO Gang Unit, notably using his JSO-issued cellphone and undercover social media account to reach out to the victim, as well as using his JSO work vehicle to travel to the victim to meet with her and engage in illegal sexual conduct.

54.    In December, 2004, a member of JSO slammed Sammy Lee Evans to the ground. As a result, Mr. Evans's head hit the ground with such force that it resulted in Mr. Evans' death. Mr. Evans was not resisting the arrest, which was for an open container of alcohol.

55.    In January, 2006, members of JSO broke the right jaw of Bryan Barnes when effectuating his arrest. The JSO members struck Barnes despite the fact that Barnes complied with all of their commands and did not resist the officers while being arrested. See Barnes v. Sheriff Rutherford, et. al., Case No.:3:08-cv-217-J-33JRK (M.D. Fla. Jacksonville Division).

56.    There was no JSO investigation of the officers' use of excessive force against Mr. Barnes until prompted by the City of Jacksonville Office of General Counsel sending of a complaint to JSO in January 12, 2011. This complaint and the accompanying investigation occurred four years after the incident, three years after Mr. Barnes filed a federal lawsuit against the officers involved and Sheriff

Rutherford, and nearly two years after said lawsuit was settled. The JSO Internal Affairs Unit concluded as follows relating to Mr. Barnes' incident: "that charge of EXCESSIVE FORCE against Police Lieutenant R. W. Beltz #7862 and Police Officer C. M. Weippert # 7829 be classified as NOT SUSTAINED.

57.     In January, 2006, a member of JSO kneed Ronal Ferrera in the face three times while Ferrera was handcuffed.

58.     In October, 2007, two members of JSO, along with a civilian "ride along," rammed the head of Colin Runge into a steel door in the intake area of the jail. At the time, Runge was fully secured and unable to resist the officers as he was in total appendage restraint, otherwise known as being "hog-tied." *See Runge v. Snow,* Case No.: 3:10-cv-900-HES-JRK (M.D. Fla. Jacksonville Division).

59.     In January, 2008, a member of JSO slammed Larue Perkins onto the pavement of a parking lot, breaking his jaw. At the time, Perkins was complying with the officer's directive to leave the parking area. Perkins was then unlawfully arrested after having his jaw broken. *See Perkins v. Tolen, et al.,* Case No.: 3:10-cv-851-RBD-TEM (M.D. Fla. Jacksonville Division). Perkins filed a written internal affairs complaint with JSO shortly after the January, 2008 incident. On January 21, 2011, almost three years after the incident, the JSO Internal Affairs Unit received an "in-house complaint" from the City of Jacksonville's Office of General Counsel regarding the January, 2008 incident involving Perkins. The subject matter of the

complaint was the JSO officer's excessive use of force against Perkins. The in-house complaint was then investigated by the JSO Internal Affairs Unit, which concluded that "the charge of Excessive Force against Police Officer R. J. Tolen #5597 be classified as NOT SUSTAINED."

60.    In September, 2008, a member of JSO dragged James Lunsford out of a police vehicle while he was handcuffed and dropped Mr. Lunsford on his head, leaving Mr. Lunsford paralyzed. The officer did so despite Lunsford's prior warning to the officer that Lunsford had four screws and a plate in his neck. *See Lunsford v. Rutherford, et. al.,* Case No.:3:09-cv-01015-MMHMCR (M.D. Fla. Jacksonville Division). Upon information and belief, the incident was referred to JSO Internal Affairs and no disciplinary action was taken against the officer involved.

61.    In May, 2010, a member of JSO fractured multiple bones in David Kemp's face by violently striking him as he laid on the ground in compliance with the officer's commands to do so. *See Kemp v. Rutherford et. al.,* Case No.: 3:10- cv-HES-JRK (M.D. Fla. Jacksonville Division). Sheriff Rutherford had actual notice of Mr. Kemp's encounter with JSO because of the federal lawsuit filed against him, yet Sheriff Rutherford failed to conduct an internal affairs investigation into the incident and officer involved and failed to discipline the officer involved.

62.    In March, 2012, members of JSO questioned Kyle Fowler concerning a stolen vehicle. At the beginning of the questioning, Mr. Fowler was told by the JSO members that he was free to go at any time he chose. After initially agreeing to speak to the officers, Mr. Fowler turned away from the JSO members due to the behavior of the officers and told them he was not interested in speaking anymore, and began to walk towards his gate. As he did so, the JSO members knocked Mr. Fowler through a closed metal gate and onto the ground. The JSO members then rolled Mr. Fowler onto his stomach, drove a knee into his back, and violently pulled his arms behind him to handcuff him, injuring Mr. Fowler in the process of effectuating his unlawful arrest. The charge on which Mr. Fowler was unlawfully arrested, resisting an officer without violence, was ultimately dismissed. The JSO members involved were not disciplined or reprimanded for their actions against Mr. Fowler.

63.    In June, 2013, a member of JSO violently slammed Robert Slade to the ground causing him to hit his head, teeth, and shoulder, after he was involved in a minor traffic accident. As Mr. Slade was merely asking the officer when his insurance information would be taken following the accident, he was forcefully thrown to the ground. Mr. Slade was unlawfully arrested for resisting an officer without violence in violation of §843.02, Fla. Stat. (2012). The charges against Mr.

Slade were dismissed. The JSO member involved was not disciplined or reprimanded for his actions against Mr. Slade.

64.    On November 12, 2014, at the Pretrial Detention Facility, a member of JSO violently slammed Deandre Ezell's head into a concrete wall, while Mr. Ezell was handcuffed. The use of force knocked Mr. Ezell unconscious and resulted in Mr. Ezell's hospitalization. At the time of the incident, Mr. Ezell was a minor.

65.    In July, 2015, members of JSO punched Kelli Wilson in the face after she refused their unlawful commands to hand over her cell phone, she was using to record public police activity. JSO officers proceeded to violently take Wilson to the ground, pulling her hair and attempting to rip her arms out from under her. Ms. Wilson was unlawfully arrested for resisting an officer without violence. The charges against Ms. Wilson were dismissed. JSO members were not disciplined or reprimanded for their actions against Ms. Wilson.

66.    On April 13-14, 2016, a JSO officer violently body slammed John Blessing who was attending a concert at Veterans Memorial Arena causing bodily injury. Blessing was arrested by that JSO officer's fiancée (also a JSO officer) for resisting without violence, disorderly intoxication, and battery. All were dismissed by the trial court.

67.    On April 27, 2016, Mayra Martinez was at her place of employment, Scores, when JSO officers arrived after calls about her intoxication. JSO officers

slammed Ms. Martinez into the pavement and punched her numerous times while refusing to allow her to obtain her government issued identification, her cell phone, or her house keys, all which remained inside her place of employment. Upon arrival at the Pretrial Detention Facility, JSO officers hit Martinez with a closed fist in her stomach, chest, and face, knocking her unconscious. Martinez remained handcuffed during the encounter.

68.    On April 4, 2017, Connell Crooms was participating in a peaceful protest at Hemming Park Plaza in Jacksonville Florida, when a counter-protestor reached his arm over the shoulder of a member of JSO and stuck his middle finger in Mr. Crooms' face. Rather than apprehend the aggressor, members of JSO threw Connell Crooms to the ground, struck him repeatedly in the back and face, and fired a Taser into his back, all of which caused Mr. Crooms to lose consciousness and require hospitalization. Mr. Crooms is deaf and did not resist or disobey any of the officers' commands.

69.    On April 26, 2017, Daniel Nyman was seeking treatment at UF Health Jacksonville when the same JSO officer who body slammed Blessing spat at Mr. Nyman, charged at Mr. Nyman, threw him to the ground, shoved Mr. Nyman's jaw into the ground with his knee, and then flipped Mr. Nyman over and kneed him in the back. Mr. Nyman required repair of his previously treated broken jaw and spent five days in the hospital as a result of the attack.

70.    In June 2017, members of JSO struck Elias Campos, a seventeen-year-old minor, multiple times, in the face, while the minor was handcuffed inside a patrol car. The minor child required medical attention at the scene.

71.    On June 23, 2017, Jonathan Williams was pulled over by JSO officers, who placed one handcuff on Mr. Williams before punching him twice in the face despite the fact he was not resisting. The JSO officer proceeded to throw Mr. Williams to the ground, punching him in the back and kneeing him in the head. As a result, Mr. Williams suffered fractures in the right orbital wall, left inferior, and medial orbital wall of his skull, as well as soft tissue swelling and hematoma in the back of his head. The officers involved in the use of force were not reprimanded or disciplined.

72.    In March, 2021, JSO officers arrested Maurice Whigham for alleged robbery, deploying, much like in the instant case, a JSO police dog on a man with his hands up. Mr. Whigham was threatened from the second he saw JSO officers with the police dog being sicced on him. When they entered the room, instead of assessing the situation and determining whether he was a threat to their safety, officers immediately loosed the dog on Mr. Whigham, who was sitting on the corner of the bed and not in an aggressive position or withdrawn weapons. Officers then forced Mr. Whigham outside the hotel room and screamed at him to roll over on to his stomach while the canine was yanking at his pants and legs.

While officers placed their weight on Mr. Whigham, much like the instant case, the officers allowed the canine to continue yanking Mr. Whigham, resulting in a broken foot.

73.     The pattern of police brutality and unwarranted use of canine force continues after BROOKS's incident. In May, 2023, Joseph Bratcher was arrested at a traffic stop and had a canine loosed on him. On body cam footage, Mr. Bratcher can be seen putting his hands out of his window and repeatedly telling the officers he is not armed, and telling the officers he is scared of the several officers with their weapons drawn and pointed at him. Once out of the vehicle, Mr. Bratcher slowly backs up to officers, per their commands, again telling them he's scared, and exhibiting no signs of being a threat to the safety of any of the officers. Despite this, JSO officers loosed a canine on Mr. Bratcher and proceed to yell at him to "bring me the dog" by crawling on the road to the officer while the dog continues biting his arm. Body cam footage reveals at least 4 officers had their guns drawn on Mr. Bratcher while the dog bit down and he was yelled at to crawl along the pavement with his arm in the canine's mouth.

74.     On September 29, 2023, JSO's Gang Unit made national news when they battered Le'Keian Woods after he ran from a traffic stop for alleged sale of cocaine. Defendant, GARRIGA, claimed he'd seen Woods sell cocaine at a gas station, but that accusation was later dropped. Defendants, GARRIGA,

MCCULLOUGH, SULLIVAN, and DAIGLE, were involved in the chase and arrest, which involved tasing Woods, causing him to fall to the ground, and then elbowing and punching Woods, and kneeing him in the head and body.

75.    While it has been held that municipalities "may not be held liable under § 1983 solely because it employs a tortfeasor" *Bd. Of Cty. Comm'rs of Bryan Cty. V. Brown*, 520 U.S. 397, 403 (1997), and that municipalities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents" *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), it has been held "municipalities may . . . be held liable for the execution of a governmental policy or custom" and "liability may attach 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997); Martinez v. Sheriff Mike Williams, et al., Case No. 3:17-cv-1319-J-20MCR (M.D. Fla. Sept. 26, 2019) (Doc. 74) (denying motion to dismiss municipal liability claim supported by similar allegations of prior incidents of excessive force, concluding that the allegations demonstrate JSO officers have, since 2004, engaged in the practice of using excessive force on Jacksonville residents" and that "the City repeatedly took no corrective steps to remedy the officers' actions")).

76.     Defendant, SHERIFF WATERS, in his official capacity, and the City of Jacksonville, have established a practice or custom of physical abuse of, and deprivation of the civil rights of, the citizens of the City of Jacksonville that is so widespread as to have the force of law and to be considered the City of Jacksonville's and JSO's policy.

77.     Establishing a policy or custom requires "a persistent and wide-spread practice", not simply random acts or isolated incidents. Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986).

78.     As shown above, said practices and customs are so widespread as to be deemed authorized by the policymaking officials as they must have known of the actions but failed to stop them. See, Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991). In the instances noted above, the Sheriff permitted, encouraged, tolerated, and ratified a pattern, practice, and custom of unjustified, unreasonable, and illegal use of force by law enforcement personnel under his control.

79.     Senior U.S. District Judge Harvey Schlesinger, in 2019, summed it up best when he wrote, in determining a plaintiff's claim was sufficient to proceed forward, that "JSO officers have, since 2004, engaged in the practice of using excessive force on Jacksonville residents" and they "illustrate that the city repeatedly took no corrective steps to remedy the officers' actions." Martinez v.

Sheriff Mike Williams, et al., Case No. 3:17-cv-1319-J-20MCR (M.D. Fla. Sept. 26,

2019) (Doc. 74, page 10).

80.     Plaintiff has satisfied all conditions precedent to bringing this action

as required pursuant to Fla. Stat. Section 768.28 and Jacksonville Ordinance Code

Section 112.

**COUNT I: 42 U.S.C. § 1983**
**vs. Defendant, SHERIFF THOMAS K. WATERS,**
**in his official capacity as Sheriff of Jacksonville Sheriff's Office**

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and

further states:

81.     SHERIFF WATERS knew canine teams were trained in the bite and

hold method of apprehension.  Under this method, a dog seeks to subdue a suspect

by biting his leg or arm, which ultimately results in injury to the suspect.  Therefore,

SHERFIFF WATERS was responsible for properly training officers in the

constitutional limitations on the use of force during arrests and the use of canines

when making apprehensions.

77.     The subject incident deprived BROOKS of his constitutionally

protected right to be free from excessive force.  Since BROOKS was in compliance

with Defendants, DAIGLE and MCCULLOUGH's orders to get on the ground,

since BROOKS freely gave himself up, without incident, through laying on the

ground in the prone position with his hands in front of his head, and since

26

Defendant DAIGLE had BROOKS's head pushed on to the ground and was kneeling on BROOKS, the use of canine force was not only disproportionally applied but was also procedurally misapplied. Thus, the use of canine Huk in this circumstance was excessive and violated BROOKS 's Fourth Amendment right that protects him from excessive force.

78.    SHERIFF WATERS k n e w omissions and failures in training and reporting, together with unenforced policy and procedures, would pose a serious risk and such inaction would result in violations to constitutionally protected rights, including the right to be free from the use of excessive force.

79.    SHERIFF WATERS's failure to implement training for officers under his direction, so that they are capable of properly performing the duties of a law enforcement officer, including the ability to lawfully effect arrests, and his failure to enforce related policies and procedures, demonstrates a deliberate indifference to the constitutional rights of the citizens of Jacksonville, including BROOKS.

80.    SHERIFF WATERS, as chief policy maker for the Jacksonville Sheriff's Officer, is responsible for the implementation and promulgation of official policies for JSO, including policies for its deputies to follow when making arrests, deploying and training canines, and the use of force when making arrests.

81.    At the time of apprehension, SHERIFF WATERS and JSO had written policies in place for canine teams.  However, it was the policy, practice, and custom

of SHERIFF WATERS and his administration not to enforce, and to ignore, written policies, allowing unregulated actions and performances of canine teams, and to maintain an inadequate system of review of police conduct, so untimely and cursory as to be ineffective; and to permit and tolerate the unreasonable and excessive use of force by police officers.

82.    At all times material hereto, WATERS and his supervisory officers, permitted, encouraged, tolerated, and ratified the pattern, practice, and custom of inadequate policies, police brutality, and violation of civil rights by failing to discipline unconstitutional and disproportionate use of force.

83.    The actions of DAIGLE, PLAUGHER, MCCULLOUGH, GARRIGA, and SULLIVAN, are the result of Sheriff WATERS's policies and customs that permit ambivalence to required reporting procedures, permit excessive, unconstitutional use of force, permit inadequate supervision during training, and permit improperly trained officers and canines out on patrol.

84.    DAIGLE, PLAUGHER, MCCULLOUGH, GARRIGA, and SULLIVAN were acting within the scope of their employment, and pursuant to the inadequate policies, procedures, and customs of Defendant, WATERS, who enforced these inadequate policies, procedures, and customs. Said policies, procedures, customs, and actions were the moving force, proximate cause, and/or affirmative link behind the conduct causing BROOKS 's injuries. SHERIFF

28

WATERS is therefore liable for the violation of BROOKS 's constitutional rights by DAIGLE, PLAUGHER, MCCULLOUGH, GARRIGA, and SULLIVAN.

85.     As a direct and proximate result of Defendant, SHERIFF WATERS's, deliberate indifference towards proper training for the officers of the Jacksonville Sheriff's Office, and as a result of the SHERIFF's toleration, allowance, and ratification of the practices, customs, and policies that led to excessive use of force and violation of civil rights, the Plaintiff sustained an infringement on his constitutional  rights; a deprivation of his liberties and freedom; bodily injuries, incurred medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing  and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

29

## COUNT II: 42 U.S.C. § 1983
## vs. Defendant, CHETH D. PLAUGHER

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

86.     The force used by Defendant, CHETH D. PLAUGHER, against BROOKS, during the course of BROOKS's arrest, was objectively inhumane and unnecessary, and constituted unreasonable and excessive use of force in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

87.     Defendant, PLAUGHER, used unreasonable and excessive force against Plaintiff when, with a depraved indifference to human life and conscious disregard for the safety of the general public and JAMARI BROOKS, he released canine Huk on BROOKS after BROOKS had already given himself up to officers and while he was already detained and being held to the ground by Defendant, DAIGLE.

88.     Defendant, PLAUGER, committed the acts described herein with a gross disregard for BROOKS's constitutional rights, while acting under color of law, and he specifically deprived BROOKS of his constitutional right to be free from excessive police force under the Fourth Amendment.

89.     As BROOKS had freely given himself up, there was no threat to the safety of any officers on scene, nor was there the threat that BROOKS would flee

from the scene. Under JSO policies and procedures, PLAUGHER's use of a police canine was therefore unnecessary. Causing severe, unnecessary pain to BROOKS, without a reasonably articulable purpose for doing so, or need to do so, is clear excessive use of force and a direct violation of BROOKS's constitutional rights.

90.    Further, Defendant, PLAUGHER, failed to exhibit control over canine Huk. Body cam footage shows the dog running with abandon, jumping in the air, running back and forth over BROOKS before attacking him, and failing to release while PLAUGHER tugged at the canine's scruff in an attempt to yank him off. This failure to control the canine constitutes excessive use of force in violation of BROOKS's constitutional rights.

91.    As a result of Defendant, PLAUGHER's, outrageous and unwarranted conduct, Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

92.    As a direct and proximate result of Defendant, PLAUGHER's, conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to

suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT III: 42 U.S.C. § 1983
### vs. Defendant, BEAU DAIGLE

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

93.    Defendant DAIGLE used unreasonable and excessive force against Plaintiff when, with a depraved indifference to human life and conscious disregard for the safety of the general public, he slammed BROOKS's head into the pavement and knelt on BROOKS's back after BROOKS had already laid down and showed his hands to officers, freely giving himself up. DAIGLE knew that forcefully pushing someone's skull into pavement had the potential to cause severe, potentially fatal harm. As BROOKS had freely given himself up, he was not a threat to DAIGLE or any other officers, and deadly force was therefore unwarranted and an excessive use of force.

94.    Further, DAIGLE knew that PLAUGHER was violating BROOKS's

constitutional rights by releasing Huk on BROOKS when BROOKS was already detained, was not resisting, and was not a threat to flee the scene. DAIGLE had a reasonable opportunity to prevent the harm to Plaintiff by stopping PLAUGHER from releasing Huk and by maintaining his detention of BROOKS. Instead, DAIGLE got off of BROOKS and backed away to allow and watch the canine attack BROOKS and thrash at his arm. DAIGLE can be seen on body cam watching the canine attack and yelling commands at BROOKS, all of which would have been unnecessary had he simply effectuated the arrest his detention of BROOKS was intended to result in. DAIGLE's failure to prevent the releasing of the canine and his failure to act after the canine attacked BROOKS both violated BROOKS's constitutional right to freedom from excessive use of force and inflicted unnecessary force and harm upon BROOKS.

95.    Defendant DAIGLE committed the acts described herein in with a gross disregard for BROOKS's constitutional rights, while acting under color of law, and he specifically deprived BROOKS of his constitutional right to be free from excessive police force under the Fourth Amendment.

96.    As a result of Defendant, DAIGLE's, outrageous and unwarranted conduct, Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

97.    As a further direct and proximate result of Defendant DAIGLE's

conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

## COUNT IV: 42 U.S.C. 1983
## vs. Defendant, TREY MCCULLOUGH

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

98.    Defendant, MCCULLOUGH's actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

34

99.    MCCULLOUGH knew canine teams were trained in the bite and hold method of apprehension. MCCULLOUGH knew that such use of force had the ability to cause severe harm to BROOKS. MCCULLOUGH, knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

100.    MCCULLOUGH knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

101.    MCCULOUGH knew that PLAUGHER and DAIGLE were violating the Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. MCCULLOUGH had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

102.    MCCULLOUGH failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. MCCULLOUGH therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

103.    MCCULLOUGH's failure to intervene and prevent the harm and/or

stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

104.   Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

105.   MCCULLOUGH allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

106.   MCCULLOUGH then, once the canine is yanked off BROOKS, proceeded to lay his bodyweight on the already detained and maimed BROOKS.

107.   As a result of Defendant, MCCULLOUGH's, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

108.   As a further direct and proximate result of Defendant, MCCULLOUGH's conduct, Plaintiff sustained an infringement on his constitutional  rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future

earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT V: 42 U.S.C. 1983
### vs. Defendant, HUNTER SULLIVAN

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

109. Defendant, SULLIVAN's, actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

110. SULLIVAN knew canine teams were trained in the bite and hold method of apprehension. SULLIVAN knew that such use of force had the ability to cause severe harm to BROOKS. SULLIVAN, knew that BROOKS had freely

given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

111.   SULLIVAN knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

112.   SULLIVAN knew that PLAUGHER and DAIGLE were violating the Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. SULLIVAN had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

113.   SULLIVAN failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. SULLIVAN therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

114.   SULLIVAN's failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

115.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

116.    SULLIVAN allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

117.    SULLIVAN then, once the canine is yanked off BROOKS, proceeded to lay his bodyweight on the already detained and maimed BROOKS.

118.    As a result of Defendant, SULLIVAN's, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

119.    As a further direct and proximate result of Defendant, SULLIVAN's conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to

suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

120.    WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

**COUNT VI: 42 U.S.C. 1983**
**vs. Defendant, JOSUE GARRIGA**

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

121.    Defendant, GARRIGA's, actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

122.    GARRIGA knew canine teams were trained in the bite and hold method of apprehension. GARRIGA knew that such use of force had the ability to cause severe harm to BROOKS. GARRIGA, knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a

police canine should be abided by.

123.    GARRIGA knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

124.    GARRIGA knew that PLAUGHER and DAIGLE were violating the Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. GARRIGA had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

125.    GARRIGA failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. GARRIGA therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

126.    GARRIGA's failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

127.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

128.   GARRIGA allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

129.   As a result of Defendant, GARRIGA's, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

130.   As a further direct and proximate result of Defendant, GARRIGA's conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

131.   WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees

pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

<b>COUNT VII: 42 U.S.C. 1983<br>vs. Defendant, LEMMUEL JOHNSON</b>

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

132.    Defendant, JOHNSON's, actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

133.    JOHNSON knew canine teams were trained in the bite and hold method of apprehension. JOHNSON knew that such use of force had the ability to cause severe harm to BROOKS. JOHNSON, knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

134.    JOHNSON knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

135.    JOHNSON knew that PLAUGHER and DAIGLE were violating the

Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. JOHNSON had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

136.    JOHNSON failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. JOHNSON therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

137.    JOHNSON's failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

138.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

139.    JOHNSON allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

140.    As a result of Defendant, JOHNSON's, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

141.    As a further direct and proximate result of Defendant, JOHNSON's conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided. demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT VIII: 42 U.S.C. 1983
### vs. Defendant, DOUG HOWELL

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

142.    Defendant, HOWELL's, actions and inactions, while in the course and

scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

143.    HOWELL knew canine teams were trained in the bite and hold method of apprehension. HOWELL knew that such use of force had the ability to cause severe harm to BROOKS. HOWELL, knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

144.    HOWELL knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

145.    HOWELL knew that PLAUGHER and DAIGLE were violating the Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. HOWELL had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

146.    HOWELL failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS.

HOWELL therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

147.    HOWELL's failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

148.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

149.    HOWELL allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

150.    As a result of Defendant, HOWELL's, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

151.    As a further direct and proximate result of Defendant, HOWELL's conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for

reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

152.    WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT IX: 42 U.S.C. 1983
### vs. Defendant, JOHN DOE (I)

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

153.    Defendant, DOE (I), is an unidentified officer, marked in FBI gear, present throughout the entire interaction. He rode to the scene in the front, passenger seat of the vehicle driven by Defendant, DAIGLE. He got out of the vehicle and followed Defendant, PLAUGHER, and canine Huk around the vehicle. His identity is expected to be determined in discovery.

154.    At all times material, Defendant, DOE (I), was acting under the color

of law and aiding the other officers in the unwarranted, unreasonable, and unconstitutional arrest and attack on Plaintiff, BROOKS.

155.    Defendant, DOE (I)'s, actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

156.    DOE (I) knew canine teams were trained in the bite and hold method of apprehension. DOE (I) knew that such use of force had the ability to cause severe harm to BROOKS. DOE (I), knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

157.    DOE (I) knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

158.    DOE (I) knew that PLAUGHER and DAIGLE were violating the Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. DOE (I) had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping

it from extending as long as it did.

159.    DOE (I) failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. DOE (I) therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

160.    DOE (I)'s failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

161.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

162.    DOE (I) allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

163.    As a result of Defendant, DOE (I)'s, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

164.    As a further direct and proximate result of Defendant, DOE (I)'s conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

165.    WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT X: 42 U.S.C. 1983
### vs. Defendant, JOHN DOE (II)

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

166.    Defendant, DOE (II), is an unidentified officer, marked in police gear, present throughout the entire interaction. He is wearing a teal/blue colored shirt and a baseball-style hat. He can be seen on body cam footage grabbing BROOKS

by the feet during the arrest. His identity is expected to be determined in discovery.

167. At all times material, Defendant, DOE (II), was acting under the color of law and aiding the other officers in the unwarranted, unreasonable, and unconstitutional arrest and attack on Plaintiff, BROOKS.

168. Defendant, DOE (II)'s, actions and inactions, while in the course and scope of his employment with JSO, during BROOKS's arrest, were unreasonable and inhumane, exhibiting a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

169. DOE (II) knew canine teams were trained in the bite and hold method of apprehension. DOE (II) knew that such use of force had the ability to cause severe harm to BROOKS. DOE (II), knew that BROOKS had freely given himself up to deputies and knew that only reasonable force was necessary to detain BROOKS. He knew that the use of canine force was only to be used where reasonably necessary and that all policies and procedures relating to the use of a police canine should be abided by.

170. DOE (II) knew that the force being used to arrest BROOKS, and the deployment of the police canine on a Plaintiff that was already in police custody, were both violations of BROOKS's civil rights.

171. DOE (II) knew that PLAUGHER and DAIGLE were violating the

Plaintiff's constitutional rights in their method of arresting BROOKS and in their deployment of the police canine. DOE (II) had a reasonable opportunity to prevent the harm to the Plaintiff by stopping the canine deployment and/or by stopping it from extending as long as it did.

172.    DOE (II) failed to prevent the canine deployment and failed to intervene, stopping the canine's continued attacks, once deployed on BROOKS. DOE (II) therefore failed to stop PLAUGHER, DAIGLE, and canine Huk from inflicting unnecessary force upon BROOKS.

173.    DOE (II)'s failure to intervene and prevent the harm and/or stop further, unnecessary harm, with reasonable opportunity to do so, were violations of BROOKS's constitutional rights, including but not limited to BROOKS's fourth amendment right to be free from excessive police force.

174.    Said actions were done under color of law, and exhibited a depraved indifference to human life and conscious disregard for the safety of the general public and the Plaintiff.

175.     DOE (II) allowed the release of canine Huk, in a situation that did not call for the same, after the Plaintiff had already had his head smashed into the pavement, and stood by on the side with the other officers, yelling contradictory commands at the Plaintiff, while the canine tore into and thrashed at BROOKS's arm.

176.    As a result of Defendant, DOE (II)'s, outrageous, unwarranted, and unconstitutional conduct, the Plaintiff required immediate medical care, including transport to the emergency room via ambulance.

177.    As a further direct and proximate result of Defendant, DOE (II)'s conduct, Plaintiff sustained an infringement on his constitutional rights, a deprivation of his liberties and freedom, bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

178.    WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, reasonable attorney fees pursuant to 42 USC §1983, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

### COUNT XI:
### State Law Claim: Battery vs. Defendant, CHETH D. PLAUGHER

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

179.    Defendant, PLAUGHER, individually and/or as an agent, employee, and/or servant of JSO, intentionally loosed upon, and/or knowingly did not control and/or stop canine Huk from attacking and biting the Plaintiff. He, in fact, led the canine over to the Plaintiff and instructed the canine to attack the Plaintiff after the Plaintiff had already given himself up to officers and while he was already in JSO custody.

180.    PLAUGHER's actions directly caused the canine to attack and batter the Plaintiff, and his actions were intentional and carried out in bad faith and with malicious intent.

181.    As a direct and proximate result of PLAUGHER's use of the police canine and/or the failure to control and/or stop the canine's attack, Plaintiff has suffered  bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing  and  Plaintiff will continue to suffer these losses in the future.

WHEREFORE,   Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

## COUNT XII:
## State Law Claim: Battery vs. Defendant, BEAU DAIGLE

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

182.    Defendant, DAIGLE, individually and/or as an agent, employee, and/or servant of JSO, intentionally and or knowingly slammed the Plaintiff's head into the pavement, knelt on his back and neck after the Plaintiff had already given himself up, and did not control or stop canine Huk from attacking and biting the Plaintiff. He, in fact, relinquished his control of the Plaintiff to allow the canine the unincumbered ability to attack the Plaintiff.

183.    DAIGLE's actions, on top of battering and causing harm to the Plaintiff, also allowed the canine to attack and batter the Plaintiff.

184.    DAIGLE's approval and consent to the releasing of canine Huk was an intended act of Defendant, DAIGLE, and was carried out in bad faith and with malicious intent as DAIGLE knew he should have intervened to prevent the constitutional violation to BROOKS.

185.    As a direct and proximate result of DAIGLE's use of the police canine and/or the failure to control and/or stop the canine's attack, Plaintiff has suffered bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring which are permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the

enjoyment of life. These losses are either permanent and/or continuing and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff, JAMARI BROOKS, demands judgment for damages, including compensatory damages and exemplary or punitive damages, costs and interest of the immediate lawsuit, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

## COUNT XIII:
## State Law Negligence Claim vs. City of Jacksonville

Plaintiff adopts and realleges paragraphs 1-80, as if fully set forth herein, and further states:

186. At all times material to this action, Defendant, CITY OF JACKSONVILLE, was and remains a governmental entity located in Duval County, Florida.

187. At all times material to this action, Defendant, CITY OF JACKSONVILLE, was and remains a political subdivision or agency of Duval County, Florida.

188. Defendant, CITY OF JACKSONVILLE (hereinafter "COJ"), and particularly its sheriff's office, owes a duty to the citizens and visitors of Jacksonville and Duval County, to operate, and to interact with the general public, as a reasonable police force would in the same or similar circumstance and to not unreasonable harm or attack the citizens and visitors of Jacksonville and Duval

County.

189.    COJ breached these duties when its officers, namely the defendants in counts II – X, without legal reason and without provocation, attacked, beat, and arrested Plaintiff, JAMARI BROOKS.

190.    Multiple Jacksonville Sheriff's Office, officers approached BROOKS with their guns drawn, screaming to get on the ground, unreasonably mistaking him for someone else, without taking any precautions to ensure they were going to arrest the correct person, who was the subject of their investigation.

191.    Despite doing nothing wrong, BROOKS complied, immediately getting on the ground and placing his hands above his head.

192.    Despite giving himself up, and despite not being the individual Jacksonville Sheriff's Office was searching for, Defendant, DAIGLE, in an extreme indifference to the health and safety of BROOKS, jumped on top of BROOKS and slammed his head into the pavement.

193.    An additional officer, Defendant, PLAUGHER, loosed his police canine on BROOKS, who had already given himself up, was not trying to escape, was not fighting back, and was indisputably detained by that point. Defendant, PLAUGHER, then allowed his police canine to viciously attack BROOKS, thrashing back and forth with BROOKS's arm in his mouth.

194.    The remainder of the officers, while BROOKS was being brutally

attacked by the police canine, stood in a circle, surrounding BROOKS, pointing and yelling at him, refusing to stop the unnecessary harm he was enduring.

195.    After an unreasonable amount of time, officers pulled the police canine off BROOKS, allowing multiple officers to jump back on top of BROOKS, who was still not fighting nor attempting to escape, and put their body weight on to his head, neck, and back, pinning him to the ground and handcuffing him.

196.    It was only at this point that the officers attempted to identify BROOKS.

197.    A reasonable officer, in a similar circumstance, would not have attacked a citizen first, without identifying them, a citizen that was not being violent or belligerent, was not attempting to run from the police, and who had freely given himself up to police custody.

198.    A reasonable officer would not loose a police canine on a citizen that was already detained, who posed no threat to the safety of other officers, nor was attempting to escape custody.

199.    A reasonable officer would stop continued, unnecessary, use of a police canine on a suspect that was not fighting back, was already detained, posed no threat to the safety of officers, nor was attempting to escape custody.

200.    BROOKS posed no threat of harm to the officers. He did not attempt to strike them. He did not pull a weapon on them. Despite the officers' mislabeling of

BROOKS's actions in the police report, he made no attempts to flee or evade arrest or detention. Still, the officers decided it was necessary to slam BROOKS into the pavement, decided it was necessary to loose a police canine on him, and decided it was the right opportunity to leave permanent scarring on a citizen of Duval County who was simply walking out of his physician's office.

201.    As a direct and proximate result of COJ officers' physical attacks, along with their unjustified and unnecessary use of a police canine and/or the failure to control and/or stop the canine's attack, along with the officers' unjustifiable stopping and detaining of the Plaintiff, as he was not the officers' intended suspect, Plaintiff has suffered  bodily injuries, medical expenses for reasonably related medical care, lost wages, loss of future earning capacity, disfigurement and scarring  which  are  permanent in nature, resulting pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. These losses are either permanent and/or continuing  and  Plaintiff will continue to suffer these losses in the future.

202.    WHEREFORE,  Plaintiff, JAMARI BROOKS, demands judgment for damages, costs and interest of the immediate lawsuit, trial by jury as to all issues so triable, and such other relief as this Honorable Court may deem just and proper.

## DEMAND FOR TRIAL

WHEREFORE, Plaintiff, JAMARI BROOKS, hereby demands a trial by jury on all issues so triable, and judgment against Defendants, THOMAS K. WATERS, in his official capacity as Sheriff of JACKSONVILLE SHERIFF'S OFFICE, CHETH PLAUGHER, BEAU DAIGLE, TREY MCCULLOUGH, HUNTER SULLIVAN, LEMMUEL JOHNSON, JOSUE GARRIGA, DOUG HOWELL, JOHN DOE (I), JOHN DOE (II), and JACKSONVILLE SHERIFF'S OFFICE.

Dated this 2nd day of September, 2025.

**PHILLIPS, HUNT & WALKER**

**/s/ JOHN M. PHILLIPS**
**JOHN M. PHILLIPS, ESQUIRE**
Florida Bar Number:  0477575
**STEVEN T. BRIDGE II, ESQUIRE**
Florida Bar Number: 1003623
660 Park Street
Jacksonville, FL 32204
Phone: (904) 444-4444
Facsimile: (904) 508-0683
Counsel for Plaintiff
jmp@floridajustice.com
steven@floridajustice.com
anne@floridajustice.com